# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### MARTINSBURG

**DENISE P. SCHMITT,**

      **Plaintiff,**

**v.**
                           **Civil Action No.   3:14CV105**
                           **(The Honorable Gina M. Groh)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

      This is an action for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Denise Schmitt's claim for disability insurance benefits ("DIB") with an alleged disability onset date of January 1, 2011. (R. 193-199).   The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.   On February 18, 2015, an oral argument hearing was held by Magistrate Judge Robert W. Trumble.   Jonathan C. Bowman, counsel for Plaintiff and Katie M. Gaughan, Assistant United States Attorney, participated by telephone.   Following oral argument hearing and review of the motions and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## I.   PROCEDURAL HISTORY

      Denise Schmitt ("Plaintiff") filed an application for DIB and SSI on March 18, 2011, alleging her onset date was January 1, 2011, and alleging disability due to fibromyalgia; carpal

tunnel syndrome; lumbosacral disc degeneration; disc protrusion at C6-7; irritable bowel syndrome; chondromalacia patellae and anterior cruciate/medial collateral ligament strain of the left knee; hearing loss in the left ear; and obesity. (R. 20). Plaintiff's DIB application was denied at the initial level. (R. 122-126). On March 25, 2011, the Plaintiff's application for SSI was denied on a non-medical basis. (R. 114-119). A request for Reconsideration was not filed on this determination and on September 20, 2011, the Plaintiff's application of SSI was denied. (R. 122-126). On December 1, 2011, Plaintiff's request for reconsideration of her DIB application was denied. (R. 128-130). Plaintiff requested a hearing on her DIB application, which Administrative Law Judge George A. Mills, III ("ALJ") held on March 14, 2013, where Plaintiff appeared in Wheeling and the ALJ appeared in Morgantown. (R. 92). Plaintiff was unrepresented for this hearing. (Id.). The ALJ discussed whether the Plaintiff wanted to continue the hearing in order to get representation. (R. 105). Plaintiff decided that she would like to get representation and the case was continued. (Id.).

On June 11, 2013, ALJ Mills held the hearing in this case by video where Plaintiff appeared in Wheeling, with her attorney, Jonathan C. Bowman, Esq. and the ALJ appeared in Morgantown with the vocational expert, Larry Ostrowski. (R. 18, 42). On June 26, 2013, the ALJ entered a decision finding Plaintiff was not disabled. (R. 18-36). Plaintiff timely filed a request for review to the Appeals Council. (R. 13). On July 24, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-5).

## II. BACKGROUND

### A. PERSONAL HISTORY

Plaintiff was born on March 12, 1962, and was fifty-one (51) years old at the time of the administrative hearing. (R. 50). Plaintiff is married and has two children, both of which are now

over the age of eighteen (18). (Id.). Plaintiff has a valid driver's license but limits the amount of driving she does because she gets stiff riding in car. (R. 51). Plaintiff completed high school in 1980 and has not had any other educational training except on the job training. (R. 52). She completed pharmacy technician training in December 2010 and a coal mining course in June 2010. (R. 246). She is not in the military but her husband was. (R. 52). She currently works an eight hour per week cleaning job for T. J. Max with her eighteen year old son. (R. 53). From 2001-2005, Plaintiff worked as an animal care supervisor at an animal hospital. (R. 246). From 2005-2006, Plaintiff worked quality control/packing at a warehouse. (Id.). From 2001-2010, Plaintiff worked in labor production and she currently works part-time cleaning. (Id.).

**B.    Medical History**

**1.    Medical History Pre-Dating Alleged Onset Date of January 1, 2011**

On March 11, 2008, Dr. Erick Fishman, PH.D., Neuropsychological Services, wrote to Dr. Midcap stating that Plaintiff's "[c]urrent testing shows performance generally in the average range compared to others her age/education/gender, with a range across specific tests from well above average to well below average.   She appears to have a mild anxiety disorder at this time. These neuropsychological test data raise question of anterior cerebral dysfunction, without etiology."   (R. 316).

At Plaintiff's August 17, 2010, examination with Christopher Tiu, M.D., she had a "unique set of complaints" including a seashell sound in her left ear. (R. 435-36). Dr. Tiu ordered an MRI to rule out a nerve problem. (R. 436). The MRI showed sinus disease, but there was no evidence of internal auditory canal lesions. (R. 337, 438). At her appointment with Stephen R. Timms, M.D., a few days later, she had a "litany of complaints." (R. 331). Dr. Timms noted that Plaintiff walked without difficulty, had only mild hip flexor

weakness, and did not have any significant muscle weakness. (R. 331). Dr. Timms noted that Plaintiff had moderate to severe stenosis at C6-C7. (R. 331). He assessed possible mild cervical myelopathy, vertigo, and left facial paresthesia of an uncertain etiology, and he doubted that Plaintiff had any muscle disease. (R. 331).

At Plaintiff's October 28, 2010, neurosurgical consultation with Matt El-Kadi, M.D., she complained of muscular pain throughout her body. (R. 341-42). But Plaintiff's muscle tone was appropriate for her age, she had no obvious joint swelling, she ambulated with a steady gait, her motor strength testing was normal, her sensation was intact, and her reflexes were normal. (R. 342). Her mental status examination was also normal. (R. 342). Dr. El-Kadi reviewed Plaintiff's cervical spine MRI, which showed a disc osteophyte at C6-C7, but was otherwise unremarkable. (R. 333, 342). He assessed that Plaintiff "may" have fibromyalgia or a muscular disorder, and recommended follow up with a neurologist, and a muscle biopsy. (R. 342).

On July 21, 2010, Plaintiff met with her treating physician, Dr. Midcap, to go over her reports and tests. (R. 371). An MRI of the cervical spine revealed that the intervertebral discs were all normal except for C6-7, which does impinge the spinal cord posteriorly and impinges the nerve root on the left side. (Id.). An MRI of the brain revealed essentially no change since the study of 2008 other than a "tiny flair bright area." (R. 370).

A return to work form stating that Plaintiff was under Dr. Midcap's care on December 21, 2010 and would be able to return to work with no restrictions on December 23, 2010 is in the record. (R. 355).

## 2. Medical History Post-Dating Alleged Onset Date of January 1, 2011

Plaintiff treated with Douglas Midcap, D.O., on February 22, 2011, for complaints including ringing of the ears, and muscle weakness. (R. 349-52). Plaintiff's strength was full, her sensation was intact, she had a good affect, and her judgment, insight, and memory were normal. (R. 351). Dr. Midcap's diagnoses included tinnitus, fibromyalgia, and supraventricular tachycardia (SVT). (R. 352). Two weeks later, Plaintiff saw Dr. Midcap for a medication check after she self-increased her beta blocker. (R. 345, 457). She was in mild distress and anxious/agitated, but her examination was otherwise normal. (R. 346-47, 458). Dr. Midcap assessed palpitations and benign hypertension and adjusted Plaintiff's medications. (R. 458).

On March 15, 2011, Plaintiff saw Christopher R. Eskins, M.D., for palpitations. (R. 375-76). He diagnosed controlled palpitations, a history of SVT, an abnormal EKG, and shortness of breath with no chest pain. (R. 376). Dr. Eskins recommended additional testing and continued her current medications. (R. 376).

When Plaintiff saw Dr. Midcap in August 2011 for back pain and a medication refill, she was doing better. (R. 460). Plaintiff's physical and mental status examinations were normal, other than anxiety. (R. 461). Dr. Midcap assessed unspecified anxiety, low back pain, benign hypertension, inflammatory and toxic neuropathy, and dermatitis, and treated her with medication. (R. 461). Plaintiff followed up in November 2011 for a medication change and IBS. (R. 463). She reported good general health, was not in acute distress, and her physical examination was normal. (R. 464). Her mental status examination was normal other than an anxious affect/mood. (R. 464). The Plaintiff denied memory loss or confusion, denies symptoms of depression and denies insomnia. (Id.). Dr. Midcap adjusted her

medications and assessed IBS, myalgia and myositis unspecified, benign hypertension, hyperlipidemia, and an upper respiratory infection. (R. 464-65).

Plaintiff reported shoulder pain to Dr. Midcap in February 2012, but denied hearing loss/ringing. (R. 466-67). On examination, Plaintiff's right shoulder was tender with crepitus and her spinal range of motion was restricted. (R. 467). Plaintiff's shoulder x-rays showed only small benign cystic changes in both humeral heads. (R. 421). Dr. Midcap gave Plaintiff a steroid injection in her shoulder and prescribed medications. (R. 468). On May 4, 2012, when Plaintiff returned to Dr. Midcap for a medication refill, she reported general good health. (R. 470). On examination, she was in mild distress and her spinal range of motion was restricted by pain. (R. 470). Dr. Midcap assessed benign hypertension, myalgia and myositis unspecified, anxiety state unspecified, hereditary peripheral neuropathy, and sinusitis. (R. 470-71).

Plaintiff's October 2012 left knee x-ray showed mild narrowing and her MRI showed chondromalacia patellae, joint effusion, and a strain of the ACL and MCL. (R. 443, 472). By December 12, 2012, Plaintiff was not in acute distress, and her neck, abdomen, gait, and mental status were normal. (R. 495-97). Her back had decreased range of motion, but no CVA tenderness. (R. 496-97). She reported constipation, but not diarrhea. (R. 495). Dr. Midcap refilled her medications, prescribed new medication for constipation, and advised her to stay active, exercise, and watch her diet. (R. 498). Then, on April 8, 2013, Plaintiff saw Dr. Midcap for refills and to fill out her disability paperwork. (R. 486, 489). Her physical and mental status examinations were normal (other than anxiety), including a normal gait (R. 490). Dr. Midcap assessed chronic pain syndrome, benign hypertension, memory loss, and depression. (R. 491). He did not prescribe any psychotropic medications. (R. 491).

On April 24, 2013, Plaintiff requested a refill of her Lidoderm patch and stated that

her disability form had been "filled out incorrectly" and needed to be fixed. (R. 481). Dr. Midcap noted that Plaintiff had "multiple multiple problems." (R. 484). He also noted that since this was her second attempt to get disability for her conditions, she was trying to find a lawyer to manage her case. (R. 484). Dr. Midcap did not even examine Plaintiff at that time, but still rendered diagnoses of fatigue and "chronic other pain." (R. 484).

### 3. Medical Opinion Evidence.

A consultative Mental Status Examination was performed on June 14, 2011, by Holly Coville, M.S., Ed.S, of Mansuetto Coville Psychological Services, PLLC. (R. 378-82). Psychologist Coville found Plaintiff "Good in terms of mental health; fair to poor in terms of physical health per Claimant's report." (R. 382). A psychiatric review technique form was completed by DDS Psychologist, Joseph A Shaver, Ph.D., on July 26, 2011 for anxiety related disorder. Dr. Shaver noted that

> Claimant's reported problems with memory and concentration appear to be inconsistent with results of her MSE. Overall, only mild impairments seem to exist in the areas of daily activities, social functioning and concentration. It is believed that Claimant possesses the mental capacity to engage in gainful work-like activity on a sustained basis.

(R. 396). On August 3, 2011, Dr. Franyutti, a medical consultant for DDS, wrote a physical residual functional capacity assessment for the Plaintiff consistent with the ALJ's RFC. (R. 398-405).

On August 25, 2011, a consultative medical examination was performed by Gabriel E. Sella, M.D. for the DDS. (R. 407). Dr. Sella noted that "[s]he walked in and out of the room without difficulty and got on and off the exam table without any difficulty." (R. 411). Dr. Sella found that she can stand without restrictions, stand and walk 5-10 minutes at a time, lift light weights, handle light objects, speak, hear and travel. (R. 412). On September 20, 2011,

Dr. Franyutti reviewed his previous RFC in light of Dr. Sella's examination and found that Plaintiff's RFC would remain the same. (R. 414). Likewise, Psychologist, Jeff Boggess of the DDS, reconsidered the alleged panic attacks of Plaintiff and found that the previous mental assessment dated July 26, 2011, should be affirmed as written. (R. 415). Additionally, Dr. Lim reviewed Dr. Franyutti's RFC on December 1, 2011 and affirmed it as written. (R. 416). A medical evaluation/case analysis was performed by Terry Hill, DDS on May 24, 2012 and she found, "Nothing new to change prior RFC of Light. Based upon a light RFC, claimant should be able to return to past work as a picker." (R. 417).

In April of 2013, at Plaintiff's request, Dr. Midcap partially completed a physical residual functional capacity (RFC) questionnaire and noted that Plaintiff was "unable to work" and "totally disabled." (R. 446-50).[1] At Plaintiff's May 14, 2013, appointment with Dr. Midcap, Dr. Midcap noted that Plaintiff was "chronically ill" and assessed myalgia and fatigue. (R. 480). He again did not physically examine Plaintiff. (R. 480). Dr. Midcap checked boxes stating that Plaintiff could lift and/or carry less than 10 pounds, stand and/or walk "less than about three hours," and sit for "less than about three hours." (R. 455). [1] Dr. Midcap checked a box indicating that Plaintiff's pushing/pulling was limited, but did not describe the degree of limitation. (R. 455). Additionally, Dr. Midcap opined that Plaintiff could occasionally engage in postural maneuvers and that her reaching, handling, fingering, feeling, and hearing were limited, but he did not describe how these abilities were limited. (R. 455). Dr. Midcap

1 Dr. Midcap diagnosed Plaintiff with IBS, carpal tunnel syndrome, memory loss, Epstein-Barr virus/fatigue, SVT, joint pain, arthritis, gastroesophageal reflux disease, tinnitus, fibromyalgia, and two other diagnoses that are illegible. (R. 446). He noted that Plaintiff's symptoms were pain, tinnitus, fatigue, and muscle pain. (R. 446). He also checked boxes stating that Plaintiff's condition was affected by depression and anxiety and circled that her pain/other symptoms would frequently interfere with attention/concentration. (R. 447). Dr. Midcap also checked a box indicating that Plaintiff was markedly limited in her ability to deal with work stress. (R. 448). He did not complete the remainder of the form, which asked him to specifically quantify her functional abilities. (R. 448-50).

then concluded once again that Plaintiff was "unable to work! Pt is disabled" (R. 455).

### C.   Testimonial Evidence

At the ALJ hearing held on March 14, 2013, Plaintiff was advised that she could be represented by an attorney at this proceeding and the court would continue this hearing so that she could obtain an attorney if she so desired.   Upon Plaintiff's request, the ALJ continued the hearing to June 11, 2013, to allow Plaintiff time to find counsel.

At the ALJ hearing held on June 11, 2013, the Plaintiff testified that she was 51 years old as of the date of the hearing. (R. 50). She further testified that she was married and had two children, both of which were now over the age of eighteen. (Id.). She graduated from high school in 1980 and has worked several jobs since that time, including a part-time cleaning job that she still performs with her youngest son. (R. 53).

Plaintiff testified as follows regarding her work experience.   In 2010, she worked part-time as a demonstrator for Great Plains Leasing. (R. 54). This job entailed being sent to a Petco or Tractor supply store and talking to people who passed by about organic dog food. (Id.). Plaintiff also worked for Wes Point Acquisitions in 2009 and 2010, where she assembled ink toner cartridges. (R. 55). Plaintiff also worked in 2010 for Blue Chip Commercial Cleaning where she cleaned for Macy's. (R. 56). She also worked for a temp service that occasionally got her work packing plastic bottles. (R. 57). She also worked for Cabella's for one season as a packer. (R. 58). A packer works at a computer terminal and scans the invoices and packs the items on the invoice in a UPS box. (R. 59). She also worked for six years as veterinarian assistant at Animal Urgent Care, which was owned by her father in-law. (R. 59-60).

Plaintiff further testified as to her medical conditions that cause her to be unable to work. (R. 61). Plaintiff testified that she cannot hear out of her left ear. She testified that her worst

medical problem is fibromyalgia and irritable bowels is a "close runner-up." (R. 62). She testified

that Dr. Alkadi recommended a muscle biopsy but when she asked him to do it, he wouldn't and

no one else will do it either. (R. 63). Plaintiff testified that she has had no surgeries nor has she

been hospitalized overnight since filing for disability. (R. 64). She testified that she has no mental

issues other than stress. (Id.). She testified that she lives on enemas, taking them several times a

day for her irritable bowel syndrome. (R. 65). Plaintiff does not receive any welfare benefits. (R.

66). Her husband is retired from the Air Force, but currently works a full time job and she has

medical coverage through him. (R. 66, 75).

Plaintiff also testified regarding her daily activities. She has a driver's license but she limits

her driving to short distances because she gets stiff. (R. 51). She is currently working part-time

helping her son clean for T.J. Max and she has trouble using the dry mop because of her carpal

tunnel or fibromyalgia. (R. 68). She further testified that walking is a massive issue because her

legs do not want to walk. (Id.). She also testified that the medication, Vicodin, makes her sweat

more when she exerts herself. (Id.). When she gets hot she has irritable bowel problems and

experiences "blow outs." (Id.). Standing is an issue because of her lower back but she testitifed

she could stand for approximately twenty minutes before needing to walk around. (R. 69).

Plaintiff testified that she gave up drinking milk because she had massive difficulty getting the

gallon milk out of the cooler. (R. 70). However, later she testified that she was cutting back on

milk because of her irritable bowel syndrome. (R. 73). She testified that her husband fixes dinner

for her children who are eighteen and twenty-three years old. (R. 75). Both children still live in the

home and do all the chores around the house, including laundry, and cleaning. (Id.). Plaintiff

helps with grocery shopping by going with the kids to Walmart and showing them what to buy.

(R. 77). She does not belong to any clubs or organizations. (Id.). Her husband tried to get her to

go with him and the kids to the Rodeo last month but she felt too stressful about finding a bathroom and not having her wash bottle with her. (R. 78). For the same reasons, she doesn't go fishing, camping, movies or out to dinner anymore. (R. 78). She can't take care of her lawn anymore and has become a cranky person. (R. 79).

**D.     Vocational Evidence**
   **1.   Vocational Expert Testimony**

Also testifying at the hearing was Larry Ostrowski a vocational expert. Mr.   Ostrowski characterized Plaintiff's past work that was substantial gainful activity as follows:   Her work as an animal caretaker was medium and semi-skilled with an SVP of 4. Her work as a small products assembler was light and unskilled. Her work as a general inspector was light and semi-skilled with an SVP of 4. Her work as an order filler (packer) was light and semi-skilled with an SVP of 3. Her work at Cabella's as a shipping checker was light and semi-skilled with an SVP of 4.   Lastly, her work as an inspector/packer was light and unskilled with a SVP of 2.   With regards to Plaintiff's ability to return to her prior work, Mr. Ostrowski gave the following responses to the ALJ's hypothetical:

> Q:     Okay.   All right well the profile for Ms. Smith is 48-51, under the regulations of Social Security doctor, she's in two age categories.   For part of the period she's a younger individual, and age 50 she becomes what we call "closely approaching advanced age."   High school education and the work that you described, a lot of it part-time, substantially except for the work she did for her father in law who was a veterinarian, they seem to be pretty indicative of full time work activity. The state agency for a same or similar individual in the record in exhibit 10F, and 14F, used a light exertional level of work activity.   Light is lifting 20 pounds occasionally, 10 pounds frequently, standing and walking up to eight hours a day, sitting up to eight hours a day with normal breaks.   Never climb any ladders, ropes, or scaffolding.   Only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. Environmental considerations were to avoid concentrated exposure to temperature extremes, fumes dust, odors, gasses and poor ventilation. In a more restrictive limitation beyond just concentrated, more restrictive in dealing with hazards.   Hazards are moving plant machinery, and unprotective heights. Looking at Ms.

Schmitt's work history that you've classified are you able to determine whether or not an individual limited to light be able to do any of the work that Ms. Schmidt did at the light level?

A: Yes your honor. It appears that this individual would be able to do the work as a demonstrator, order filler, and shipping checker.

Q: Let's assume that for some reason including but not limited to the fact that you indicated that perhaps the industrial cleaner work that she was doing now, might be performed more at light than at medium, but I noted it wasn't listed as one of the possible alternative that could be performed. I'm going to ask you to assume that the jobs that you indicated may not be substantial under the definition of Social Security regulations, and ask you if you can more accurately identify any jobs that can be performed to satisfy that hypothetical in the region, to be defined by you?

A: Yes your honor. And I'll define the local economy as consisting of the Wheeling, Bridgeport metropolitan statistical area, which includes Ohio, Marshal Counties in West Virginia, and Belmont County in Ohio, and I'll combine that with 10 percent of jobs in the Pittsburgh metropolitan statistical areas as well as the state of Ohio based on department of labor statistics. There would be the work of a storage facility rental clerk, this a light and unskilled job with an SVP of 2, in the local economy there's 700 jobs, in the national economy 179,200 jobs. There would be the work of a marker, this is a light and unskilled job with SVP of 2, in the local economy there are 1,200 jobs, in the national economy 250,200 jobs. There would be the work of a mail clerk, this is a light and unskilled job with an SVP of 2, in the local economy--- and this is a job in a mail room of a business as opposed to working for the postal service, if I haven't said that already. In the local economy there are 400 jobs, in the national economy 70,800 jobs.

(R. 82-4).

Incorporating the above hypothetical, the ALJ then questioned Mr. Ostrowski regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels.

Q: All right, for part of the period that I would consider, let's assume sedentary exertional level, using the same hypothetical that I used in light, but changing the exertion level to 10 pounds occasionally, less than five pounds on a frequent basis, standing and walking as only required to be performed two hours out of an eight hour day, sitting primarily up to 8 hours, again with normal breaks. With the other postural and environmental consideration, that you've previously considered applicable. At the sedentary level for part of the period, would there be jobs that you can identify?

A:      Yes, your honor.   There would be work of a document preparer.   This is a sedentary and unskilled job with an SVP of 2, in the local economy there are 680 jobs, in the national economy 143,200 jobs.   There would be the work of an [inaudible] sealer, this is a sedentary and unskilled job with an SVP of 2, in the local economy there are 200 jobs, in the national economy 32,200 jobs.   There would be the work of a charge account clerk, this is a sedentary and unskilled job with and SVP of 2, in the local economy there are 190 jobs, in the national economy 33,700 jobs.

(R. 84-5).

The ALJ then questioned Dr. Ostrowski regarding Dr. Midcap's partially filled out RFC,

Exhibit 24F and 25 F, which had little detail except the opinion "unable to work." (R. 86, 87).

Q:   Well doctor, without knowing anymore, based on limitations in standing, walking and sitting for less than three hours in an eight hour day, would sedentary work be available to an individual limited in that fashion or what[sic] it be less than sedentary, in your opinion?

A:   This would be less than sedentary your honor.

(R. 86).

Finally, the ALJ questioned Mr. Ostrowski about Plaintiff's ability to work if she is

completely credible as to the severity of her condition:

Q:      And then finally if the testimony is considered good and credible, supported by the medical evidence, assume that the residuals of all of her conditions, including her back and her neck and knees, the irritable bowel, the blood pressure, the dermatitis issue on her skin and rashes, the fibromyalgia and the fatigue associated with fibromyalgia, would affect concentration, persistence, and pace to a degree of mark, a person with marked limitations and concentration, persistence, and pace would be off task a third of the eight hour work day, for five days a week for forty hours.   The degree of being off-task would approach a third of the work day and absences would exceed more than two in a thirty day period, but I'm contemplating here, she would perhaps would need four or more in a thirty day period.   If that would be the case, would there be any jobs that you could identify?

A:      No your honor, there would be no jobs for this hypothetical individual.

(R. 87). Plaintiff's attorney chose not to question Dr. Ostrowski when provided the chance. (R. 88).

### 2. Vocational Analysis

A report of contact form dated August 3, 2011, signed by Rose Bettis, from social security office in Clarksburg, West Virginia, noted that Plaintiff has the residual functional capacity to return to her past relevant work as a "picker" in a warehouse filling orders. (R. 277). Ms. Bettis further opined that the claimant could perform light work with postural restrictions. Her mental assessment was non severe with no work restrictions. (Id.).

In a vocational analysis reconsideration form dated December 1, 2011, Steven Phillips of the social security office in Clarksburg agreed that Plaintiff could perform her past work. (R. 295).

## F. LIFESTYLE EVIDENCE

On April 7, 2011, Plaintiff filed a Function Report – Adult. (R. 254-62). Plaintiff wrote that she experienced weakness in the arms and legs and cognitive difficulty. (R. 254). Plaintiff further wrote she had muscle ache, cramping, body overheating, blurry vision, foot pain, hand pain, sleeping from 11am to 2pm and frequent urination or bowel movements. (Id.).

As for daily activities, Plaintiff wrote that she showers, performs enema, eats breakfast and takes pills, performs an enema, works one and a half hours, showers, performs enema, eats lunch and takes pills, naps for two to four hours, puts in a small load of laundry, picks son up from school, performs enema, eats snack and goes to bed. (R. 255). She reported that she doesn't leave the house for any length of time because of IBS and frequent urination. (Id.). She further reported that she cannot carry anything up the stairs, she can't go for walks or to gym, she doesn't see clearly or hear well anymore and can't do yard work anymore. (Id.).

As for her personal care, Plaintiff wrote that she has difficulty hooking her bra; she cannot close her eyes while showering or she loses her balance; and she has to hold on to the sink when she sits down on the toilet because of weak leg muscles. (Id.). However, Plaintiff can care for her hair, feed herself, make her own meals and does not need reminders for personal grooming or taking her pills. (R. 256).

As for house and yard work, Plaintiff wrote that she cannot do any yard work because she no longer has the muscle strength and her heart flutters and she sweats. (R. 257). As for shopping, Plaintiff wrote that she spends one hour per week at a food shopping store. (Id.) Her husband handles the money because she no longer is able to pay attention to when the bills are due. (R. 258). For her interests and hobbies, she wrote that she watches TV and naps. (Id.). Additionally, she sleeps more since her conditions began. (Id.). For social activities, Plaintiff wrote that she does not spend time with other people other than her weekly food shopping. (Id.).

When discussing her abilities, Plaintiff wrote that her health problems affect all things listed in Question 20a except walking, completing tasks and getting along with others. (R. 259). But when answering the question "How far can you walk before needing to stop and rest?" She answered that she does only what is needed and that she does not go to parks or on walking trips. (Id.).

When answering questions about her attention, she wrote that she will lose thought during a conversation and she doesn't finish what she starts. (Id.). She also wrote that she follows verbal and visual instructions better than written instruction. (Id.). She remarked that her memory is gone. (R. 261). For example, she can't remember her children at any age except now. (Id) She reported that she almost "died twice" since 2004[2] and there is something wrong with her brain. (Id.).

---

2  Despite her self-report, the objective medical records do not support these disclosures.

Plaintiff filled out a Personal Pain Questionnaire and wrote that she experiences pain in every part of her body constantly throughout each day. (R. 272). She further notes that, "[t]he pain is under control but they have an ache." (Id.). She relieves the pain by not moving. (R. 272). Plaintiff takes Vicodin and Lyrica. (R. 273).

On November 13, 2011, Plaintiff filed a Disability Report- Appeal alleging that her condition had worsened since she last completed a disability report. (R. 280). She wrote that she had panic attacks, irritable bowel syndrome, fibromyalgia and blurry vision. (Id.). These new conditions approximately began on October 24, 2011. (R. 290).

On February 2, 2012, filed a disability report stating that in December of 2011 movement of her shoulders and buttocks were worse and that she was unable to complete bowel movements and had to perform self-enemas several times per day. (R. 297). Plaintiff wrote that is has become more difficult to dress and give herself enemas because of her shoulder pain. (R. 300).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Mills made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since January 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*)

3. The claimant has the following sever impairments: fibromyalgia; carpal tunnel syndrome; lumbosacral disc degeneration; disc protrusion at C6-7; irritable bowel syndrome; chondromalacia patellae and anterior cruciate/medial collateral ligament strain of the left knee; hearing loss in left ear and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567 (b) except that she should never climb ladders, ropes or scaffolds.   She should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.   The claimant should avoid concentrated exposure to temperature extremes, fumes, dust, odors, gases and poor ventilation.   She should avoid even moderate exposure to hazards such as moving plant machinery and unprotected heights.

6.    The claimant is capable of performing past relevant work as a demonstrator, order filler and shipping checker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2011, through the date of this decision (20 CFR 404.1520(f)).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "our scope of review is specific and narrow.   We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).   Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.   If there is evidence to justify a refusal

to direct a verdict were the case before a jury, then there is 'substantial evidence.'" <u>Hays</u>, 907

F.2d at 1456 (<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the

Commissioner's decision, the reviewing court must also consider whether the ALJ applied the

proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means

of an improper standard or misapplication of the law."  <u>Coffman v. Bowen</u>, 829 F.2d 514, 517

(4th Cir. 1987).

### B.   Contentions of the Parties

Plaintiff contends:

1.      The ALJ did not apply the law correctly when he accorded "little weight"
to the opinion of Douglas Midcap, D.O., a treating physician and his
decision was not supported by substantial evidence.

2.      The ALJ's RFC and credibility analysis were not supported by substantial
evidence because there was evidence that Plaintiff had difficulties with
walking, sitting, or standing and the fact that she was working on a very
limited part-time basis should not be used against her in a credibility
determination.

The Commissioner contends:

1.      There is no legal error in the ALJ's analysis of the weight given to Dr.
Midcap's opinions and his decision was supported by substantial evidence.

2.      Substantial evidence supports the ALJ's RFC and credibility determination.

### C.   Analysis of the Administrative Law Judge's Decision

**1.   The ALJ correctly applied the law when he accorded Dr. Midcap's opinions dated
April 24, 2013, and May 14, 2013, little weight and his decision was supported by
substantial evidence.**

Plaintiff alleges the ALJ erred because he failed to properly consider Dr. Midcap's opinion

as the law requires.   Plaintiff specifically asserts the ALJ is required to set forth in his decision a

discussion of each of the factors contained in 20 C.F.R. §§ 404.1527 and 416.927, but failed to do

so; and erred in his rejection of Dr. Midcap's opinions because Dr. Midcap expressed an opinion on the ultimate issue that the Plaintiff was unable to work, which is an issue reserved for the Commissioner. (Pl.'s Br. at 9).   Defendant contends the ALJ followed controlling regulations in his evaluation of Dr. Midcap's opinion (Def.'s Br. at 9-10).

Title 20 C.F.R. §§ 404.1527(c) and 416.927(c) govern how the Commissioner is to weigh medical evidence.   It mandates the following:

(c) *How we weigh medical opinions*.   Regardless of its source, we will evaluate every medical opinion we receive.   Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*.   Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*.   Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.   If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.   We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*.   Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more

weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. . . .

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

Further, Social Security Ruling 96-2p specifically addresses the ALJ's duty of explanation

when a treating source opinion is not given controlling weight:

[T]he . . . decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

The ALJ accorded Dr. Midcap's opinions "little weight" for the following reasons:

…[I]t is not consistent with the objective medical signs and findings in the record. His opinion that the claimant is unable to work is an opinion on an issue reserved to the Commissioner (20CFR 404.1527(e)(1)). The undersigned notes that while the claimant has impairments that could reasonably be expected to cause some limitation of function, Dr. Midcap's opinion that the claimant has marked limitation in dealing with work stress and pain that would frequently interfere with her attention and concentration is not

20

supported by the records of her examining health care providers. Further his opinion that the claimant is totally disabled is inconsistent with the fact that the claimant continues to work on a part-time basis.

The medical evidence indicates that the claimant has no neurological deficits. She has shown no difficulties with walking, sitting or standing. Her fine and gross manipulation abilities are intact. These findings do not support the degree of limitation assessed by Dr. Midcap It is notable that Dr. Midcap's progress note on April 24, 2013, indicated that he did not physically examine the claimant, and it appears that he based his opinion at least in part upon the written notes that she brought him about her condition.

Dr. Midcap re-evaluated the claimant on May 14, 2013. The claimant reported that she still had muscle pain and joint pain. Dr. Midcap again indicated that he did not physically evaluate the claimant, but just talked to her about filling out her disability form (Exhibit 27F/1-4).

(R. 28).

The ALJ's decision was "sufficiently specific to make clear . . . the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Id. at *5. See Pinson v. McMahon, 3:07-1056, 2009 WL 763553 (D.S.C. Mar. 19, 2009) (holding the ALJ properly analyzed the treating source's opinion even though the ALJ failed to list the factors listed in Title 20 C.F.R. §§ 404.1527(c) and 416.927(c) or specifically address each one). The undersigned finds the ALJ in the instant case properly and thoroughly weighed and evaluated Dr. Midcap's opinion when assigning it weight. As noted above, the opinion of a treating physician will be given controlling weight only if that opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c). "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if

persuasive contradictory evidence exists to rebut it.   Craig v. Chater, 76 F.3d 585, 589 (4th

Cir. 1996).   In his decision, the ALJ found Dr. Midcap's opinion was inconsistent with the

full longitudinal record and was not supported by the record (R. 28, 34).   He made specific

reference to the following:

- **Fibromyalgia-** In February 2012, Dr. Midcap diagnosed Plaintiff with fibromyalgia. On August 17, 2011, Plaintiff told Dr. Midcap that that she "was doing better and her symptoms were alleviated by medication." Dr. Sella wrote after a consultative examination on August 25, 2011, that "In terms of fibromyalgia, it was diagnosed in 2008 by the local rheumatologist.   She is presently on Lyrica with excellent results. She does not have any specific tender or trigger points compatible with ACR criteria for fibromyalgia.   If she has fibromyalgia, it is very well controlled."(R. 26, 33).

- On November 8, 2011, the Plaintiff reported during an examination with Dr. Midcap that she was in good general health with no joint pain or stiffness. (R. 27).

- **Irritable Bowel Syndrome-** On November 8, 2011, Dr. Midcap diagnosed Plaintiff with irritable bowel syndrome, but "…there is no evidence of the claimant being seen by a gastroenterologist or having a colonoscopy or other tests to determine the cause of her gastrointestinal symptoms."   (R. 29).

- **Anxiety disorder-** On November 8, 2011, Dr. Midcap reevaluated Plaintiff noting that she denied memory loss, confusion, insomnia and symptoms of depression.   She did report nervousness and Dr. Midcap did not prescribe any psychotropic medication.   (R. 33).   On December 17, 2012 and on April 8, 2013 Plaintiff reported being anxious to Dr. Midcap.   Dr. Midcap noted that her mental status was grossly normal and did not prescribe psychotropic medications.   He further noted that Plaintiff was trying to apply for disability and she brought in papers for him to fill out.   (R. 33).   Plaintiff testified at the hearing that she did not have any mental health issues other than stress and she has never received any mental health treatment. (R. 34).   However in Dr. Midcap's RFC he indicates that Plaintiff has marked limitations in ability to deal with work stress and that her anxiety and depression affect her physical conditions.   (R. 447-48).

22

- **Ambulation:** Physical examinations of the Plaintiff have consistently shown no neurological deficits and no difficulty with ambulation. (R. 28, 33). On December 17, 2012 and April 8, 2013 during exams of Plaintiff, Dr. Midcap noted that her gait was normal. (R. 27, 492).

- Dr. Midcap indicates in both the April 24, 2013 progress note and the May 14, 2013 progress note that he did not physically examine the Plaintiff on either occasion that he just talked with her about filling out her disability forms. (R. 28).

In his decision, the ALJ described Dr. Midcap's opinions as to Plaintiff's mental health limitations as follows:

> He indicated that she was not a malingerer, and he stated that emotional factors contributed to the severity of her symptoms and functional limitations. He reported that the claimant had depression and anxiety in addition to her physical impairments…. He opined that her experience of pain or other symptoms was frequently severe enough to interfere with her attention and concentration. He further opined that the claimant had a marked limitation of her ability to deal with work stress. Dr. Midcap stated, "Unable to work in my opinion. Totally disabled." He indicated that these limitations had applied for the past seven years (Exhibit 24F).

(R. 27). With regard to Plaintiff's mental health, the ALJ gave significant weight to the opinion of Psychologist Coville, who completed a clinical interview and mental status examination of the Plaintiff on June 20, 2011. The ALJ found the following:

> The undersigned has given significant weight to Ms. Coville's opinion, as she is a specialist in psychology, and her opinion is well supported by the mental status testing she performed. Her opinion is also consistent with the other medical evidence of record.

(R. 32). With regard to the DDS mental health professionals, the ALJ also gave significant weight to them. Dr. Shaver completed a July 26, 2011, Psychiatric Review Technique of Plaintiff and Psychologist Jeff Boggess affirmed that opinion on November 28, 2011. Dr.

Shaver noted that Plaintiff's reported problems with memory and concentration appear to be inconsistent with results of her MSE. "Overall, only mild impairment seems to exist in the areas of daily activities, social functioning and concentration." (R. 396).

As for physical limitations, the ALJ described Dr. Midcap's opinions as follows:

> Dr. Midcap also completed a functional capacity assessment on May 14, 2013. He opined that the claimant could lift and carry less than ten pounds frequently and occasionally. He further opined that she could stand and walk for less than three hours in an eight-hour day and sit for less than three hours in an eight-hour day. Dr. Midcap stated that the claimant was limited in her ability to push and pull. He opined that she was limited in her ability to climb, balance, stoop, kneel, crouch, crawl, bend, reach, handle, finger, feel, and hear. He also noted that the claimant had environmental restrictions, although he did not state what these restrictions were. Dr. Midcap opined that the claimant was disabled and unable to work (Exhibit 25F).

(R. 28). Dr. Sella, internal medicine specialist, completed a consultative exam of Plaintiff for the DDS on August 25, 2011. Although the ALJ agreed with Dr. Sella's opinions that Plaintiff had no heart murmur and was on no specific antiarrhythmic medication, that examination of Plaintiff's ears did not demonstrate significant hearing loss, that Plaintiff had moderate anxiety and that her fibromyalgia was controlled by medication, he only gave "some" weight to Dr. Sella's opinions for the following reasons:

> The undersigned has given some weight to Dr. Sella's opinion, as it is generally well supported by the objective medical signs and findings noted in his examination of the claimant. However, the undersigned finds that there is little objective support for the restriction on standing and walking for five to ten minutes at a time, as the claimant has no neurological abnormalities and evidenced no difficulty with walking, heel and toe walking, squatting or hopping....

> Dr. Sella opined that the claimant could handle light objects
> (Exhibit 11F). The undersigned has given some weight to Dr.
> Sella's opinion, but notes that the claimant had above average grip
> strength on testing. There is no evidence of her having any
> difficulty with fine or gross manipulation.

(R. 27, 29). The ALJ also gave significant weight to the opinion of Dr. Franyutti, who

completed an RFC assessment on August 3, 2011 and a case analysis on September 20,

2011, and the opinion of Dr. Lim, who affirmed that opinion on December 1, 2011. The

ALJ specifically stated that:

> As for the opinion evidence, the undersigned has considered the
> opinions of the claimant's treating and examining physicians,
> which have been discussed in greater detail in the body of this
> decision (20 CPR 404.1527). The undersigned has also
> considered the opinions of the State Agency medical and
> psychological consultants who evaluated the claimant at the initial
> and reconsideration levels of appeal (SSR 96-6p). The
> undersigned has given significant weight to the opinion of the
> State Agency medical consultants, as this opinion is reasonable
> and well supported by the objective medical signs and findings in
> the record. These consultants had the opportunity to review all of
> the available medical evidence, and their opinion is consistent
> with this evidence.
>
> The undersigned has also given significant weight to the opinion
> of the State Agency psychologists, as their opinions are also well
> supported by the medical evidence. The claimant did not allege
> any significant mental problems at the time of the hearing, and she
> has not had any mental health treatment since the State Agency
> psychologists rendered their opinion.
>
> In sum, the above residual functional capacity assessment is
> supported by the opinions of the State Agency medical and
> psychological consultants, the evaluations of Dr. Sella, Dr.
> Fishman, and Ms. Coville, and the records of Dr. Midcap, Dr. El-
> Kadi, Dr. Eskins, Dr. Timms and Dr. Tiu.

(R. 35).

　　The ALJ was correct in considering the opinions of the state-agency physicians.

"[A]dministrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence . . . ." See 20 CFR § 404.1527(e)(2)(i). His finding that their opinions are "reasonable and well supported by the objective medical signs and findings in the record " is supported by the evidence as evaluated and discussed by the ALJ. Conversely, the opinions of Dr. Midcap contained in the "Physcial Residual Functional Capacity Questionnaire" that was partially filled out on April 24, 2013 without an exam are inconsistent with the above noted evidence and his own medical records. Dr. Midcap's May 14, 2013, Functional Capacity Assessment is also inconsistent with the above evidence and provides no details or explanations for the limitations he checked off. (R. 455).

The Plaintiff contends that the ALJ erred in his legal analysis in three respects. First, the ALJ did not cite to any of the six (6) specific factors for weighing opinion evidence. (Pl's Br. at 10). However, as shown above the ALJ discusses a minimum of three of those factors in his decision: supportability, consistency and specialization.

Second, Plaintiff 's contends that the ALJ legally erred in rejecting Dr. Midcap's opinion because it spoke to the ultimate issue of disability. (Pl.'s Br. at 11). As noted above, the ALJ did not reject Dr. Midcap's opinion in total, he assigned little weight to his opinions because he found they were inconsistent with the record, appeared to be based on Plaintiff's subjective statements provided to him in written form for the purpose of filling out the assessment, were not supported by the record, and, to the extent that he opines on the ultimate issue of disability, his opinions tread on an issue reserved to the Commissioner. The opinion expressed by Dr. Midcap relative to Plaintiff's disability is an issue reserved to the Commissioner because it is an administrative finding that is dispositive of a case; *i.e.*, that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will

26

determine that the claimant is disabled. See 20 C.F.R. § 404.1527(d). 20 C.F.R. § 404.1527(d)(3) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Such opinions of Dr. Midcap cannot, therefore, be accorded controlling weight or even any special significance.

Lastly, a review of the April 24, 2013, partially completed Residual Functional Capacity Questionnaire and May 14, 2013, Functional Capacity Assessment, completed by Dr. Midcap, shows that he did not attach relevant treatment notes and test results to support his finding. (R. 446-450, 455). In fact on the Physical RFC Questionnaire Dr. Midcap left questions 15-16 blank which requested specific limitations and instead wrote: "unable to work in my opinion. totally disabled." (R. 448). On the one page "Functional Capacity Assessment" submitted by Dr. Midcap, again, he did not fill in any functional limitations to question "I." and instead wrote "unable to work patient disabled." (R. 455).[3] "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." See 20 C.F.R. § 404.1527(c)(3).

As the fact-finder, the ALJ is responsible for considering the medical opinions of record and weighing each opinion. 20 C.F.R. § 404.1527. The weight afforded to a medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. Id. at (c)(3)-(4). See Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) ("…if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly

---

3 See Masonv. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (reliability of checkmark reports, in which a physician's obligation is only to "check a box" or fill in a blank is suspect ("weak evidence at best")). See also Norman v. Comm'r of Soc. Sec., 2014 WL 5365390 (Oct. 21, 2014) (noting that Mason has been cited with approval by a number of courts in the Fourth Circuit).

less weight."). Opinions of treating physicians are entitled to controlling weight only if they are supported by medical signs and laboratory findings and are consistent with the record as a whole. 20 C.F.R. § 404.1527(c). A treating source's opinion is evaluated and weighed under the same standards applied to all other medical opinions, taking into account factors including the opinion's supportability, consistency, and specialization. See id. The Commissioner is not bound by a treating physician's opinion, and may reject it, if there is a lack of clinical data supporting it, or if there is contrary medical evidence. See id. In this case, Dr. Midcap's opinions are not supported by the clinical date, are not consistent with the record as a whole and are not consistent with the opinions of the other examining specialists.

Accordingly, the undersigned finds that there was no legal error in assigning Dr. Midcap's opinions little weight and the decision was supported by substantial evidence.

**2. Substantial Evidence supports the ALJ's findings regarding Plaintiff's RFC and credibility determination.**

Plaintiff contends that Dr. Midcap opined in "numerous places in the medical evidence of record that the Plaintiff had difficulty walking, sitting and standing" but he fails to cite any objective medical evidence of record to support his contention (Pl.'s Br. at 11). Although there is some evidence in the record that Plaintiff has difficulty walking, it is her own statements not medical evidence. The ALJ specifically notes in his decision that Plaintiff has stated that "'Walking is a massive issue.' She noted that when she worked, her son did the store first while she went around and spot cleaned. The claimant stated, 'My legs do not want to walk.'" (R. 25). However, the Plaintiff cites no objective medical evidence to support her problems walking. In fact, the majority of Dr. Midcap's medical records indicate she has a normal gait. (R. 490, 496). Plaintiff cites to DDS consultative examiner, Dr. Sella, for his opinions that Plaintiff could sit and stand for five minutes at a time. However, Plaintiff even testified that she can sit and stand for twenty

minutes at a time. (R. 69). Additionally, the ALJ found little objective support for this five minutes a time restriction concluding that Plaintiff had "…no neurological abnormalities and evidenced no difficulty with walking, heel and toe walking, squatting or hopping." (R. 27). The ALJ elaborated on this by pointing to Dr. Sella's own medical findings during his examination which state as follows:

> NEUROLOGIC: She walked in and out of the room without difficulty and got on and off the exam table without any difficulty. Normal motor and sensory…. Rhomberg and tandem walk are negative. Toe walking and heel walking are negative. Squatting and hopping are negative.

(R. 411-12). The state agency reviewing physicians both opined that Plaintiff could perform a range of light work that was consistent with the RFC (R. 35, 398-405, 414, 416). [4] Despite Plaintiff's October 2012 knee MRI findings, her gait was normal in December 2012. (R. 27, 33, 443, 472). Plaintiff has not been referred to an orthopedist and no knee surgery has been recommended. (R. 33).

Lastly, Plaintiff contends that the ALJ irrationally focused on Plaintiff's part-time, eight (8) hour per week, janitorial job that she does with her eighteen year old son to undermine Plaintiff's credibility as to the extent of her pain. (Pl.'s Br. at 12). Other than Plaintiff's testimony and paragraph two of the ALJ's decision where he sets forth Plaintiff's part-time work and concludes that it is not substantial gainful employment, the undersigned can only find one other place in the decision where the part-time janitorial position is mentioned. The ALJ stated as follows:

> The undersigned notes that while the claimant has impairments that could reasonably be expected to cause some limitation of function, Dr. Midcap's opinion that the claimant has a marked

---

[4] See 20 C.F.R. § 404.1527(e)(2)(i) (ALJ is entitled to rely upon, and must consider professional assessments from state agency psychologists trained in social security law because they are highly qualified experts in social security disability evaluation)

> limitation in dealing with work stress and pain that would
> frequently interfere with her attention and concentration is not
> supported by the records of her examining mental health care
> providers. Further, his opinion that the claimant is totally
> disabled is inconsistent with the fact that the claimant continues
> to work on a part-time basis.

(R. 28). Plaintiff's reference to this one time statement by the ALJ as an "irrational focus" is an unwarranted exaggeration. It is clear that the ALJ is noting for the record that the partially filled out RFC forms signed by Dr. Midcap indicating summarily that she is "unable to work" with nothing to substantiate that opinion is clearly inconsistent with the fact that she is working, albeit in a very limited capacity.

It appears that the Plaintiff also contends there was not substantial evidence to support the ALJ's credibility determination in formulating his RFC.  When formulating the RFC assessment, the ALJ appropriately considered the  claimant's subjective complaints. 20 C.F.R. § 404.1545(e). This Court must give great  deference to the ALJ's credibility determinations. See 20 C.F.R. § 404.1529(c). See also Darvishian v. Geren, 404 F. App'x 822, 831 (4th Cir. 2010) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal."). Although her part-time work  does not constitute substantial gainful activity, it is certainly evidence of her every day limitations or lack thereof. [5]

Other factors the ALJ considered regarding her RFC and the credibility of her limitations were as follows:  Dr. Midcap diagnosed Plaintiff with tinnitus on February 22, 2011, but there was no evidence of this problem at her August 2011 evaluation with Dr. Sella. (R. 34, 411). On February 2, 2012, Dr. Midcap noted that Plaintiff denied hearing loss or ringing in her ears. (R. 34,

---

[5] See 20 C.F.R. § 404.1571("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did").

467).

With respect to her carpal tunnel syndrome, in August 2011, Dr. Sella reported that her grip strength was above average, and although she had mild hypotrophy of the thenar muscles bilaterally, there was no evidence that Plaintiff had any significant difficulty with fine or gross manipulation or handling. (R. 34, 412).

Plaintiff denied having any mental health issues other than stress at the administrative hearing and has never received mental health treatment. (R. 33, 64). Plaintiff engaged in significant daily activities including: working part-time, washing laundry, picking up her son from school, preparing simple meals, vacuuming, driving a car, and grocery shopping. (R. 25, 51, 53, 74, 77, 254-59).

Because the objective medical evidence, limited treatment history, and extensive daily activities in this case fail to support Plaintiff's subjective complaints, the ALJ's credibility finding and RFC are supported by substantial evidence.

## V.   RECOMMENDED DECISION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits was supported by substantial evidence and there was no error of law. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 10) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such

objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 14th day of May, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE